FILED

2015 Nov-05  AM 07:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **BERNADINE NEVELS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:13-cv-02241-AKK** |
| **CITY OF BIRMINGHAM, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Bernadine Nevels ("Bernadine"), Flarenzell Nevels ("Flarenzell"), and Wendell Nevels ("Wendell") (collectively "Plaintiffs") bring this case against Officers William Sipes ("Sipes"), Christopher R. Hays ("Hays"), Demarius Jackson ("Jackson"), and Henry E. Higgins III ("Higgins") (collectively "Officers"), as well as Birmingham Police Department Chief A.C. Roper ("Chief Roper") and the City of Birmingham ("City") (collectively "Defendants"). Doc. 17. Plaintiffs claim that the Officers, operating in their individual and official capacities, subjected them to unreasonable search and seizure and excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments and 42 U.S.C. § 1983, and that Chief Roper and the City had implemented a custom or practice of permitting such unconstitutional actions. *Id.* Plaintiffs accuse all Defendants of violating Alabama common law by committing the torts of assault and battery,

false light, and invasion of privacy, and they additionally accuse Chief Roper and the City of negligent training and supervision. *Id.* Defendants assert a qualified immunity defense under § 1983 and state-agent immunity defense under ALA. CODE § 6-5-338 (1975) and now move for summary judgment. Doc. 41. Their motion is fully briefed and ripe for review. Docs. 42, 46, and 47. Based on a review of the evidence and the law, except as to the claims against Sipes in Counts I and III related to the initial encounter with Flarenzell, the motion is due to be granted.[1]

# I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials

---

[1] Plaintiffs have also filed a motion to strike affidavits that Defendants submitted in support of their motion for summary judgment. Doc. 45. Because striking an affidavit under the sham affidavit doctrine requires an "inherent inconsistency" between the affidavit and the prior testimony, the court **DENIES** the motion insofar as it moves to strike Sipes's affidavit regarding Flarenzell's hands, as Sipes's affidavit does not directly conflict with his deposition testimony. *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984). The court did not reach the question of whether the altercation between Flarenzell and Sipes was excessive, so to the extent the motion addresses Sipes's testimony on those issues it is **DENIED**. Because the court did not rely upon Sipes's testimony regarding whether there was a crowd in front of the Nevels's house or whether the Nevels family members were using profanity, that motion as it pertains to these grounds is **DENIED**. Additionally, Plaintiffs move to strike Defendants' statements regarding their culpability as to the constitutional, state, and qualified immunity claims on the basis that they are overly conclusory. The court **DENIES** this aspect of the motion because the statements at issue do not ultimately change the court's analysis.

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not

required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL ALLEGATIONS

The plaintiffs in this case are a mother (Bernadine) and her sons (Flarenzell and Wendell). Doc. 42-9 at 5. The Officers—Sipes, Hays, Higgins, and Jackson—were police officers for the Birmingham Police Department ("BPD") during the relevant period. Docs. 42-2 at 2-3; 42-6 at 2-3; 42-4 at 2-3; 42-3 at 2-3.

### A. Sipes's Stop of Flarenzell

On the afternoon of December 22, 2011, Sipes was patrolling Beat 427, a high crime neighborhood that experiences a number of burglaries, especially during the Christmas holiday. Doc. 42-19 at 6, 12. While driving on Pearson Avenue, Sipes saw Flarenzell and Isaac Bolden ("Bolden") crossing the street. *Id.*

at 7. According to Sipes, the two were "walking towards the direction of the CITGO [gas station]," a popular place for drug deals and, at that time, the location of a two-car accident. *Id.* at 7-8, 9. Because Flarenzell and Bolden had not engaged in any suspicious conduct, Sipes drove past them and around a curve, where he lost visual contact with the two men for about one minute. *Id.* at 8. When Sipes turned and returned to the area by the CITGO, he saw the two men "just standing there looking in the direction of the CITGO" towards the wreck. *Id.* at 8, 9.

Sipes's suspicions were aroused because Flarenzell and Bolden were "kind of standing there near a stop sign." *Id.* at 9-10. In his deposition, Sipes explained his decision to approach Flarenzell and Bolden as follows:

> Q: What was—why did you stop?
>
> [Sipes]: At that point, you know, my—it made me a little suspicious that, you know, they had gone to the store—because like I said, when I first saw them I figured, hey, they're going to the store.
>
> Q: Because, I mean, there a lot of people that go to the store—
>
> [Sipes]: Exactly. Yeah.
>
> Q: —in that neighborhood; right?
>
> [Sipes]: Exactly. So that—that was not out of the ordinary. So when I drove past the second time and they were standing across from the store that kind of raised my suspicions just due to the—to describe the CITGO it's—you have a lot of—you know, I've made narcotics arrests. I've worked shootings. There's been drug raids actually on the—
>
> Q: On the premises?
>
> [Sipes]: Actually on the CITGO itself.
>
> …

> Q: Ok. So you suspected that there was some sort of narcotic activity potentially?
>
> [Sipes]: I'd say possible criminal activity.
>
> Q: You had a hunch?
>
> [Sipes]: Uh-huh.[2]

*Id.* at 10. Additionally, Sipes noted that because he "d[idn't] remember seeing anything in their hands that would say they had purchased anything from the store," he suspected they may have purchased narcotics, doc. 42-21 at 6-7, and decided to conduct a "field interview," doc. 42-19 at 10-11.

Flarenzell testified that he and Bolden came to the scene from Bernadine's home because they heard a "loud crash" and wanted to see if anyone was hurt. Doc. 42-8 at 10-11. The accident had attracted as many as a dozen concerned pedestrians, and a police officer was at the scene processing the wreck. *Id.* at 10-11. While watching the aftermath of the accident, Flarenzell noticed that a different police officer, later identified as Sipes, was looking at them. *Id.* at 10-11. Because Flarenzell "didn't see [Sipes] look at [anybody] else," he grew concerned that Sipes "look[ed] like he want[ed] to stop and mess with [them]," so he and Bolden

_____

[2] Later in his deposition, Sipes added:

> Just a suspicion. And I won't even say narcotic. It was just—you know, that area—or that gas station is just a hub for, like I said, anywhere from shootings to narcotics. . . . But what got my suspicion was when they went to the store—I can't remember if they purchased anything—and then walked across the street and then just stayed there looking at the store. . . . I don't know if they went to the store. I just know they were on the store's property.

Doc. 42-19 at 12.

turned to return to Bernadine's house. *Id.* at 11. Sipes approached the two shortly

thereafter. Doc. 42-9 at 1.

The events that transpired next are in dispute. Sipes states that he

approached Flarenzell and Bolden and asked for permission to speak with them,

which Bolden granted. Doc. 42-19 at 10-11. Flarenzell purportedly did not respond

and instead stood still.[3] *Id.* at 10; doc. 42-20 at 1. Sipes decided to pat Flarenzell

down because Flarenzell was "nervous when [Sipes] was walking up to him, with

his hands in his pockets."[4] Doc. 42-20 at 1. Apparently, Flarenzell's nervousness

was unusual because citizens living in Beat 427 interacted frequently with police.

*Id.* Sipes also "became suspicious of Flarenzell . . . due to his behavior," in part,

---

[3] Sipes claims that Bolden gave him permission to talk to him, doc. 54 at 11, 12, and that he interpreted assent from Flarenzell's silence to his question: "[H]e didn't do a verbal, but, like I said, the body language—you know, you'll kind of know with body language. He didn't say. He kind of just stood there," docs. 42-19 at 12; 42-20 at 1.

[4] Sipes's deposition testimony regarding Flarenzell's hands differs from his affidavit and his police report, in which Sipes claims that Flarenzell's hands were moving inside his pockets. Docs. 42-2 at 5; 42-14 at 6. In his deposition, Sipes never included Flarenzell's hands as a reason for his stop or frisk. Docs. 42-19 at 10; 42-20 at 1; 42-21 at 6. Sipes had the opportunity to review his police report—which did note that Flarenzell's hands were moving—during his deposition, doc. 41-21 at 4, and he still neglected to include this fact in his explanation for his decision to search Flarenzell. By Defendants' own admission, "any variations of testimony or instances of failed memory go to the weight and credibility of the evidence." Doc. 47 at 2 (referencing *Stephens v. Broward Sheriff's Office*, 84 F. Supp. 3d 1327, 1332 n.1 (S.D. Fla. 2014)). Because on summary judgment the court is prohibited from making credibility judgments or weighing evidence, whether Flarenzell's hands were moving constitutes a triable issue of fact for a jury to decide. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("A definite distinction must be made between discrepancies which create transparent sham[ affidavits] and discrepancies which create an issue of credibility or go to the weight of the evidence.").

because when he asked Flarenzell if there was anything in his pockets, "[h]e did not answer which further increased [Sipe's] suspicion." Doc. 42-2 at 5.

To no surprise, Flarenzell paints a different picture. Allegedly, Sipes "started walking to [him] like real fast," stating, "I need to search y'all and ask y'all some questions. I've been hearing about some break-ins." Doc. 42-9 at 1. Flarenzell claims that he told Sipes that Sipes could not search him because "[he] ha[dn't] d[one] [any]thing," and that "[Sipes] kept walking towards [him] and grabbed [him] by [his] shorts . . . [and then] by [his] shirt." *Id.* Flarenzell "tried to get away because [he] was so scared," but "[Sipes] ripped [his] shirt open and grabbed [him] by [his] hair . . . punched [him] in the face, pulled [his] hair out and [m]aced [him]."[5] *Id.*

Because the mace was "not effective," Sipes turned next to his baton, but it slipped from his hand before he could use it. Doc. 42-20 at 4. As Flarenzell stood up, Sipes tried unsuccessfully to restrain him by grabbing his torn shirt. Doc. 42-9 at 2. Flarenzell fled to Bernadine's house, *id.* at 2-3, with Sipes chasing him on foot, and calling for backup. Docs. 42-3 at 4-5; 42-4 at 4-5; 42-6 at 4; 42-20 at 4-5.

---

[5] Sipes maintains that he walked behind Flarenzell and, because Flarenzell's hands were in his pockets, grabbed Flarenzell's wrists to "pull [Flarenzell's] hands out" of his pockets. Doc. 42-20 at 2. When Sipes held Flarenzell's wrists, "[a]t that point, [Flarenzell] started resisting . . . it was more of a try to get away . . . initially." *Id.* The altercation escalated from there.

### B. Bernadine's First Encounter with the Police

Sipes approached Bernadine's house with his gun drawn, and was "bamming on the [front] door" and demanding with profanity-laced language that Flarenzell exit the house. Doc. 42-9 at 6, 9. Shortly thereafter, more officers arrived and surrounded the house. *Id.* When officers Jackson, Higgins, and Hays arrived, Sipes relayed that he attempted a "field interview" and that, during the pat down, Flarenzell resisted and fled. Docs. 42-2 at 7; 42-20 at 9. As they attempted to secure the scene and apprehend Flarenzell, the officers noticed a crowd of neighbors gathering in the vicinity. Doc. 42-3 at 4-5; 42-4 at 4-5; 42-6 at 5.

At some point, Bernadine stepped onto the front porch to talk to the officers. Doc. 42-31 at 1. However, rather than answering her questions, the officers directed a barrage of epithets at her: "F[uck] you. F[uck] you. I'm calling . . . DHR to get your children. You ain't going to have your children. We'll burn this so and so down." Doc. 42-32 at 2. Also, a female police officer began shoving Bernadine "forcefully" towards a patrol car, saying, "I want you to get in the car. You get in the car." *Id.* After initially refusing and demanding to know "what [was] going on," Bernadine eventually agreed to sit in the car and requested to speak to the officer in charge. *Id.* Eventually, Hays, a BPD sergeant, arrived and spoke with Bernadine. Doc. 42-31 at 3. Hays informed Bernadine that she needed to convince Flarenzell to turn himself in because there was "no way around" his getting

arrested. *Id.* at 5. Bernadine agreed to comply, but first used the encounter to inform Hays that the officers were "off the chain" and behaving "very unprofessional[ly]." *Id.* Once inside the house, Bernadine spoke with her lawyer, and convinced Flarenzell to turn himself in. *Id.*

### C. Flarenzell's Arrest

Officers Hays, Higgins, and Jackson were on the porch when Flarenzell exited the house. Docs. 42-3 at 6; 42-4 at 6; 42-6 at 7. As soon as Bernadine opened the door, "the police slammed [her] door open, grabbed Flarenzell, and pulled him out. And one of [the officers] got his hand around his neck[ and] slung him down on the porch . . . ." Doc. 42-31 at 6. According to Flarenzell:

> I'm thinking they're just going to put my hands behind my back and put me in handcuffs. The biggest [officer] out there like jumped on my back, and it was three of them on me. And they [were] like put your hands behind your back, but my hands [were] behind my back. And he was choking me. And I was down there for a long time. . . . I put my hands behind my back. He was still choking me. I was telling him I couldn't breathe, but I couldn't talk loud enough because he was choking me. They put my—they put my hands in handcuffs and grabbed me.

*Id.* at 2. Then, "two [officers] took [Flarenzell] to the car, and they slung [him] on the trunk," and then another "pushed [him] in . . . the backseat" of the police car. *Id.* at 2-3. Allegedly, the Officers pulled multiple dreadlocks pulled from Flarenzell's head during the encounter. Docs. 42-17 at 2; 42-18 at 2; 42-18 at 5. Ultimately, Flarenzell pleaded guilty to disorderly conduct. Doc. 42-16 at 4.

The officers dispute Flarenzell's version of the arrest, and maintain that Flarenzell "lunged toward" them when he exited the house. Docs. 42-3 at 7; 42-4 at 6; 42-6 at 7. Moreover, when they took Flarenzell to the ground, he "continued to resist by kicking and yelling profanity" until they handcuffed him. Docs. 42-3 at 7; 42-4 at 6; 42-6 at 7. The officers added that there was a sense of urgency because "[a] crowd . . . had gathered and [Flarenzell's yells from inside the house were] causing alarm,"—indeed, as Flarenzell put it, "a lot of people [were] outside," including at least five of Flarenzell's family members. Docs. 42-3 at 4; 42-4 at 4; 42-5 at 4; 42-6 at 4; 42-10 at 2.

### D. Wendell's Arrest

After Flarenzell's arrest, Wendell exited the house through a side door and asked the officers what they were doing.[6] Doc. 42-26 at 3-4. In response, Officers Orlando McKinley, Gerald Owens, and Jonathan Evans pulled their guns and demanded that Wendell lie on the ground as they arrested him. Docs. 42-10 at 4; 42-26 at 3. The officers then threw Wendell to the ground and handcuffed him. Docs. 42-10 at 4; 42-31 at 3. As the officers walked him to a squad car, "the head supervisor" on the scene purportedly approached Wendell and relayed that "[t]his is my street, this is my street." Doc. 42-26 at 4, 7. The officers then "threw

---

[6] The Officers, however, aver that Wendell exited the side door yelling, "Fuck the police. . . . Man fuck y'all, I got something for y[']all. . . . Y[']all ain[']t nothing but a bunch of bitch[e]s." Docs. 42-5 at 5-6, 42-6 at 6.

[Wendell] on the trunk" of the car as they performed a search incident to his arrest. *Id.* at 6.

### E. Bernadine's Second Encounter with the Police

During Wendell's arrest, the female police officer on the scene approached Bernadine and said, "I want you." Doc. 42-31 at 9. The statement prompted Hays to tell the officer to "shut up, [and to] get around the front" of the house. *Id.* Another officer then "stuck his hands in the back of [Bernadine's] pants and went to pulling [her], trying to pull [her] out of the driveway to the front."[7] 42-31 at 2, 9. When the sergeant noticed the officer "yanking" Bernadine, *id.* at 2, the sergeant "said, ['G]et your hands off her, get around [to] the front[ of the house,']," *id.* at 9.

### III.   ANALYSIS

Plaintiffs plead six counts, two claims under federal law and four under state law. Under Count I, Plaintiffs allege violations of their Fourth, Fifth, and Fourteenth Amendment rights against the Officers for (1) subjecting Flarenzell to an unlawful search and seizure; and (2) subjecting all Plaintiffs to unlawful seizure and excessive force. Doc. 17. Under Count II, Plaintiffs allege violations of their Fourth, Fifth, and Fourteenth Amendment rights against Chief Roper, in his

---

[7] Bernadine identifies this officer solely as: "The big guy, the big police [officer] that was on the porch that threw Flarenzell down was behind me with his hands in my pants," doc. 42-31 at 9, and "The man police [officer who] was on the porch that had thr[own Flarenzell] down on the porch," *id.* at 2.

individual and official capacity, and the City for a policy, practice, or custom of using excessive force.[8] *Id.* Plaintiffs also allege a number of state law claims: (1) assault and battery against all Defendants (Count III); (2) negligent supervision and/or inadequate training against Chief Roper and the City (Count IV); (3) the tort of false light against all Defendants (Count V); and (4) invasion of privacy against all Defendants (Count VI). *Id.* As shown below, the court finds that summary judgment is due to granted on all claims except as to Sipes in his individual capacity for the Fourth Amendment claims under Count I and for the assault and battery claims against him in Count III related to the initial encounter with Flarenzell.

---

[8] Although Plaintiffs plead violations of the Fifth and Fourteenth Amendments in Counts I and II, they do not rely upon these grounds in opposing summary judgment. Therefore, the court will grant summary judgment as to these claims. *See, e.g.*, *Edmondson v. Bd. of Trustees of Univ. of Ala.*, 258 Fed. App'x 250, 253 (11th Cir. 2007) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) (noting that the "district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of summary judgment motions") (citation omitted).

## A. Constitutional Claims Against the Officers[9]

Plaintiffs assert that Sipes, Hays, Higgins, and Jackson have infringed upon their constitutional rights in violation of 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

The Officers deny that they have violated Plaintiffs' constitutional rights. Alternatively, they claim that they are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). "Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, 'protecting from suit all but the plainly incompetent or one who is knowingly

---

[9] To the extent that the Plaintiffs allege a cause of action against the Officers in their official capacity, summary judgment is due to be granted because the City remains a defendant in the case. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (noting that "when an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent").

violating the federal law.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *Pearson*, 555 U.S. at 231). Relevant here, qualified immunity protects officials from suit, not just from litigation; that is, if the claims against them can be resolved at the summary judgment phase, the court must appropriately do so. *See Pearson*, 555 U.S. at 231-32.

To invoke qualified immunity, officers "must first establish that [they were] acting within the scope of [their] discretionary authority." *Case*, 555 F.3d at 1325. Plaintiffs do not contest this fact. Therefore, "[t]he burden shifts to the [P]laintiff[s] to overcome the defense of qualified immunity." *Id.* (citing *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)). To do so, Plaintiffs must show that (1) the Officers violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 236; *Hope v. Pelzer*, 536 U.S. 730, 736-39 (2002).

In this circuit, courts use "two methods to determine whether a reasonable officer would know that his conduct is unconstitutional." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011). "The first method looks at the relevant case

law at the time of the violation; the right is clearly established if a 'concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law.'" *Id.* (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1333 (11th Cir. 2008)). "This method does not require that the case law be 'materially similar' to the officer's conduct; 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.* (quoting *Hope*, 536 U.S. at 741). Indeed, "[t]he contours of the right" must be appropriately articulated such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "But, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" *Fils*, 647 F.3d at 1291 (quoting *Hope*, 536 U.S. at 740-41).

"The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer] notwithstanding the lack of fact-specific case law.'" *Id.* (alteration in original) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1355 (11th Cir. 2002)). "This method—termed 'obvious clarity'—is a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Id.* (citations omitted) (citing *Ferraro*, 284 F.3d at 1198-99). "But, where the officer's

conduct is so outrageous that it clearly goes 'so far beyond' these borders, qualified immunity will not protect him even in the absence of case law." *Id*. at 1291-92 (quoting *Reese v. Herbert*, 527 F.3d 1253, 1274 (11th Cir. 2008)).

With this legal framework in mind, the court will now consider each Plaintiff's Fourth Amendment claims.

### 1.  Illegal Search and Seizure—Flarenzell Only

Flarenzell argues that Sipes's stop violated his "right to be free of unreasonable searches and seizures as guaranteed by the Fourth . . . Amendment[] . . . and protected under § 1983." Doc. 17 at 8. "The Fourth Amendment, of course, applies to all seizures of the person, including seizures that involve only a brief detention short of a traditional arrest." *Brown v. Texas*, 443 U.S. 47, 51 (1979) (quotations and citations omitted). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person, . . . and the Fourth Amendment requires that the seizure be reasonable." *Id.* at 51 (quotations and citations omitted). "'[W]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

"The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

"[W]hether reasonable suspicion exists must be determined on a case-by-case basis in view of the totality of the circumstances." *United States v. Gordon*, 231 F.3d 750, 757 (11th Cir. 2000) (citing *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)); *see also Sokolow*, 490 U.S. at 7. "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation," and one important factor may be "the fact that the stop occurred in a 'high crime area.'" *Id.* However, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citations omitted). Moreover, "although police have the right to approach individuals and ask questions, the individual has no obligation to respond. The person may decline to answer and simply go on his or her own way, and the refusal to respond, alone, does not provide a legitimate basis for an investigative stop." *Id.* at 122 (relying on *Florida v. Royer*, 460 U.S. 491, 497-98 (1983)).

When determining whether a search was objectively legally reasonable, the court "look[s] to see whether 'the facts available to the officer at the moment of the

seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.'" *United States v Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2002) (citing *Terry*, 392 U.S. at 21-22); *see also Creighton*, 483 U.S. at 641. "A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000). Therefore, an officer is entitled to qualified immunity—and, thus, summary judgment—if he has "arguable" reasonable suspicion to support an investigatory stop. *Id.* at 1166.

Because of the complicated nature of the incident here, the court must first determine at what point Sipes "seized" Flarenzell for purposes of the Fourth Amendment. As mentioned above, an individual is "seized" whenever an officer restrains his freedom to walk away; further, "[i]t is only when an officer, 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred.'" *See Terry*, 392 U.S. at 19 n.16. Here, while Sipes maintains he "just kind of pull[ed] up along the edge of the curb where they were standing," got out of the car, and asked to speak with Flarenzell and Bolden, doc. 42-19 at 11, the court must view the facts in the light most favorable to Flarenzell, *see Adickes*, 398 U.S. at 157. In that regard, according to Flarenzell, Sipes "started walking to [Flarenzell] like real fast," stated that he needed to search Flarenzell and Bolden and ask them some questions, and,

although Flarenzell told Sipes he could not search him, Sipes still approached in a fast, seemingly aggressive, manner. Doc. 42-9 at 1. Accepting Flarenzell's version as true—as it must at this juncture—because Sipes ignored Flarenzell's response and approached Flarenzell and Bolden aggressively, the court infers that Flarenzell felt unable to leave and submitted to Sipes's show of authority—and was therefore seized—from the time of Sipes's initial approach. *See California v. Hodari D.*, 499 U.S. 621, 627-27 (1991) ("[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (quotations and citations omitted).

With regard to whether arguable reasonable suspicion existed for the stop, again, viewing the facts in the light most favorable to Flarenzell, he and Bolden engaged in normal law-abiding behavior. Specifically, they decided to watch the aftermath of a wreck, stayed across the street from the wreck and out of the way of the officer processing the wreck, and decided to leave after about three minutes when they noticed Sipes watching them closely. As they did so, Sipes approached them in a somewhat aggressive fashion, told Flarenzell he was going to search him, ignored Flarenzell's protest to the contrary, and grabbed him by his shirt and his shorts. There is simply no reasonable suspicion for the stop and search under Flarenzell's version of the encounter.

In fact, even under Sipes's version of events, no arguable reasonable suspicion existed for the stop. Sipes merely saw two men walking towards a gas station known for drug deals, lost sight of the men when he rounded a corner, and returned to find them standing across the street from the gas station one minute later. As Sipes described it, based solely on the neighborhood, he had a hunch and "just a suspicion"[10] about Flarenzell and Bolden and decided to stop and frisk them. Such a vague suspicion runs contrary to the rule set out in *Terry* that officers "must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Terry*, 392 U.S. at 27; *see also Gordon*, 231 F.3d at 756 (noting that when the defendants were "sighted standing, at night, within ten feet of a parked car, surrounded by largely abandoned buildings, in an area notorious for violent crime and drug trafficking [that] *standing alone, these facts would not have justified this [Terry] stop*") (emphasis added). Indeed, it is well established that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *See Wardlow*, 528 U.S. at 124.

Likewise, Flarenzell's purported nervousness was insufficient to substantiate the stop. Nervousness is a natural reaction to an approaching police officer, *see*

---

[10] Indeed, the court believes that a reasonable officer would have similarly factored the two-car wreck and the crowd that had gathered as a result into his "totality of the circumstances" analysis when determining whether he believed his suspicion of the two men was reasonable or not. *See Gordon*, 231 F.3d at 757.

*United States v. Perkins*, 348 F.3d 965, 970-71 (11th Cir. 2003) (noting that a "nervous driver is not itself suspicious"),[11] and this court will not ignore this established law simply because Sipes believes people in high crime areas who are used to dealing with law enforcement are generally not nervous around officers. Flarenzell's purported silence to Sipes's request to search him also does not create reasonable suspicion, as he had "no obligation to respond" to Sipes's questions. *See Wardlow*, 528 U.S. at 124. Moreover, the court finds that merely because Flarenzell was standing with his hands in his pockets is also not sufficient to justify a stop.[12] Viewing these facts in combination, as this court must, the facts simply fall short of establishing reasonable suspicion for Sipes's actions. *See Sokolow*, 490 U.S. at 9 (requiring courts to view a defendant's actions "taken together" because "there could, of course, be circumstances in which wholly lawful conduct might justify" reasonable suspicion) (quotations and citations omitted).

---

[11] *See also United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005) ("Nervousness is a common and entirely natural reaction to a police presence[.]") (alteration in original); *United States v. Portillo-Aguirre*, 311 F.3d 647, 656 n.49 (5th Cir. 2002) (noting that courts "often give little or no weight to an officer's conclusional statement that a suspect appeared nervous").

[12] The only Eleventh Circuit case this court could find upholding an investigative stop based significantly on a plaintiff having his hands in his pockets is *Clark v. City of Atlanta*, 544 Fed. App'x 848 (11th Cir. 2013). *Clark* is distinguishable, however, because the police had arguable reasonable suspicion for the seizure because "the officers were aware that there had been a rash of burglaries in the area, that vacant properties were often targeted for burglaries, and that the property where the [plaintiffs] were standing appeared to be vacant." 544 Fed. App'x at 853. Unlike the plaintiff in *Clark*, Flarenzell was not standing on the doorstep of an abandoned home, and Sipes has presented no such similarly condemning fact to the court.

In light of the court's finding that Sipes violated Flarenzell's constitutional right, the court must next address the second part of Sipes's qualified immunity defense, i.e., whether the constitutional right was clearly established. *See Pearson*, 555 U.S. at 236. The case law relevant here has clearly stated that officers cannot stop and frisk citizens for the reasons Sipes articulates in this case. Therefore, the court rejects Sipes's qualified immunity defense and finds that a reasonable police officer would have known that he lacked reasonable suspicion to stop Flarenzell and that he was violating clearly established law in doing so. Accordingly, summary judgment as to the Fourth Amendment claim against Sipes in his individual capacity for an unlawful investigative stop is due to be denied.

The motion is, however, due to be granted for Hays, Jackson, and Higgins because they were not present at the initial stop and only came to the scene after Flarenzell fled. Finally, because a material dispute exists as to whether Sipes's initial stop of Flarenzell was legal, the court will similarly deny summary judgment under the Fourth Amendment as to the force Sipes used against Flarenzell during the initial stop.[13] *See Williamson v. Mills¸* 65 F.3d 155, 158-59 (11th Cir. 1995)

---

[13] Defendants assert that, because Flarenzell pleaded guilty to disorderly conduct, this action is barred. This situation has already been addressed at length by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), and by the Eleventh Circuit in *Hadley*. In *Heck*, the Supreme Court noted, "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 487.

(holding that a claim that any force used during a false arrest is excessive is
subsumed in the false arrest claim itself because damages for false arrest include
damages for use of force to effect that false arrest); *see also Jackson*, 206 F.3d at
1170-71 (noting that "*Williamson*'s rule makes sense because if a stop or arrest is
illegal, then there is no basis for any threat or any use of force, and an excessive
force claim would always arise . . . .").

### 2. Excessive Force—All Plaintiffs

With respect to the encounter at Bernadine's house, all three Plaintiffs allege
the Officers subjected them to excessive force. The Fourth Amendment's
guarantee against "unreasonable searches and seizures," U.S. Const. amend. IV,
"encompasses the plain right to be free from the use of excessive force in the
course of an arrest[, investigatory stop, or other 'seizure' of his person]," *Graham
v. Connor*, 490 U.S. 386, 395-96 (1989). If "the nature and quality of the intrusion
on the [plaintiff's] Fourth Amendment interests" outweigh "the countervailing
government interests at stake," the seizure has violated the plaintiff's constitutional
rights. *Tennessee v. Garner*, 471 U.S. 1, 8 (1985); *see also Graham*, 490 U.S. at

---

Faced with a plaintiff who had pled guilty to resisting arrest but who was advancing a § 1983
claim for excessive force for that same encounter, the Eleventh Circuit in *Hadley* noted that,
although the plaintiff had taken a guilty plea to resisting arrest, "the question [on summary
judgment] becomes . . . whether a jury could conclude that at some point [the police officer]
punched [the plaintiff] when he was not resisting? If so, there is a constitutional violation not
barred by *Heck*." 526 F.3d at 1331. Therefore summary judgment is not inevitable here because,
even though Flarenzell pleaded guilty to disorderly conduct, the question remains for the jury
whether Sipes used excessive force against him before he was acting disorderly.

388. However, the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof. *Brown v. City of Huntsville*, 608 F.3d 724, 737 (11th Cir. 2010) (citations omitted). As a result, claims alleging that an officer used excessive force during the course of an arrest or other "seizure" are analyzed under an objective reasonableness standard. *Graham*, 420 U.S. at 388; *see also Hadley*, 526 F.3d at 1329. That is, the officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Courts determine whether the "nature and quality of the intrusion" on Fourth Amendment interests surpasses the government interests at stake by considering "1) the need for the application of force, 2) the relationship between the need and the amount of force used, and 3) the extent of the injury inflicted." *Vinyard*, 311 F.3d at 1347 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir. 1986)). To evaluate the need for the application of force, courts follow the factors laid out in *Graham*—"the severity of the crime, the danger to the officer, and the risk of flight." *Ferraro*, 284 F.3d at 1198. The guiding principle in excessive force cases is that "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley*, 526 F.3d at 1330; *see also Huntsville*, 608 F.3d at 738. However, courts are instructed to remember that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary . . . ." *Graham*, 490 U.S. at 396-97.

### a. Bernadine's Excessive Force Claim

Bernadine's claim against the Officers is based on her contention that (1) a female officer pushed her from her home and into a police car, and later approached Bernadine threateningly until Hays chastised the officer and instructed her to leave the area; and (2) "the big guy, the big police [officer]" placed his hands in her pants until Hays chastised him by telling him to "get his hands off [B]ernadine." Doc. 42-31 at 9. The court can quickly dispense of the claims regarding the conduct of the non-defendant female officer. While "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance," *Hadley*, 526 F.3d at 1330 (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)), Bernadine does not allege that Sipes, Hays, Higgins, and Jackson—the defendants she seeks to hold liable for the female officer's conduct—were near this officer when she pushed Bernadine from the house and into the police car. To the contrary, as far as the court can discern, Hays arrived after the

incident,[14] doc. 42-40 at 10; the BPD had removed Sipes from the house by the time the incident occurred, doc. 42-31 at 1-3; and although Plaintiffs claim that there were many officers on the front porch, doc. 42-9 at 8, they do not explicitly place Higgins and Jackson on the porch, nor do they argue that these two officers were already at the house by the time of the incident involving Bernadine and the female officer. Therefore, none of the Officers may be held liable for the unnamed female officer's behavior.

Next, as to "the big guy, the big police [officer]" who purportedly placed his hands in Bernadine's pants, Bernadine does not identify this officer as being one of the Defendants in the case. Moreover, she does not state that the defendant Officers observed the behavior and failed to correct it. In fact, to the contrary, she states that Hays instructed the unnamed officer to stop. Doc. 42-31 at 9 ("[G]et your hands off of her, get around to the front."). In short, Bernadine has failed to provide any basis for this court to hold the Officers liable for the conduct of "the big guy, the big police [officer]." Alternatively, the claim for the conduct of the "big guy, the big police [officer]" also fails because "the application of force, without more, will not support a claim for excessive force." *Nolin v. Isbel*, 207 F.3d 1253, 1257 (11th Cir. 2000). Bernadine has simply failed to present sufficient facts to support her claim.

_____

[14] After Wendell's arrest, Hays disciplined the female officer and stopped her behavior. Doc. 42-31 at 9.

### b. *Flarenzell's Arrest*

Flarenzell also asserts a claim of excessive force related to his subsequent arrest at the residence. *See* doc. 17 at 6-10. As a threshold matter, Sipes is entitled to summary judgment on this excessive force claim because he was not at the scene and did not participate in Flarenzell's arrest. *See* doc. 42-20 at 10. As to the other defendants, viewing the evidence in the light most favorable to Flarenzell, he fled to his mother's house, watched an officer approach with his gun drawn, waited inside while his mother spoke with Hays, decided to voluntarily turn himself in, non-threateningly opened the burglar door, and stepped calmly onto the front porch. At that point, Hays, Higgins, and Jackson threw Flarenzell to the ground, Jackson climbed on top of his back, and an officer choked Flarenzell until the others handcuffed him. The officers then threw Flarenzell against the back of the police car.

Unfortunately for Flarenzell, the events he describes are insufficient to sustain his excessive force claim, in part, because Hays, Higgins, and Jackson reached the scene after Sipes called for backup to arrest a fleeing suspect. Their background knowledge consisted of only what Sipes had told them about the incident: that he had stopped Flarenzell, that Flarenzell fought back when Sipes tried to pat him down, and that Flarenzell fled and barricaded himself in a house. While Flarenzell may believe Sipes stopped him unjustifiably, "[h]eadlong flight . .

. is the consummate act of evasion" and is "certainly suggestive of [wrongdoing]."

*Wardlow*, 528 U.S. at 124. More problematically for Flarenzell, he ran inside, out

of the officers' sight, and refused to exit for about ten minutes. As far as the

officers were concerned, Flarenzell may have armed himself while inside the

house. To add further to the tense standoff, the parties agree that a crowd had

gathered outside to watch the commotion. In light of the potential threat to the

crowd and to the officers, it was prudent for Hays, Higgins, and Jackson to

immediately seize control by arresting Flarenzell. In short, from the reasonable

officer's perspective on the scene, Hays, Higgins, and Jackson were justified in

aggressively taking Flarenzell to the ground when handcuffing him.

Flarenzell's claim that the officers used excessive force when they pushed

him against the police car after he was handcuffed and offering no resistance is

similarly unavailing. While this court recognizes that the Eleventh Circuit has

denied summary judgment on some excessive force claims by handcuffed

plaintiffs, *see, e.g.*, *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)

(handcuffed plaintiff who did not struggle or resist, and the officers beat his head

into the sidewalk until he was unconscious), here, Flarenzell fails to assert

appropriate evidence to substantiate an excessive force claim. Namely, he presents

no evidence—beyond stating that he was "slung" and that he thought the officers'

behavior was unnecessary—to establish the amount of force actually used against

him. This lack of evidence counsels against a finding of excessive force here. *See Huntsville*, 608 F.3d at 740 ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559-60 (11th Cir.1993) (finding no excessive force for arresting an unresisting plaintiff for a building code violation by pushing him against a wall and applying a chokehold while affixing handcuffs).

Under these facts, Hays, Higgins, and Jackson's use of force in the arrest and the walk to the car was reasonable. Consequently, the Officers' motion as to the claim of excessive force in Flarenzell's arrest is due to be granted.

### c. *Wendell's Arrest*

Wendell similarly asserts an excessive force claim for his arrest and for his treatment when handcuffed. Docs. 17 at 8-10; 42-26 at 6. However, Wendell fails to identify Sipes, Higgins, Jackson, or Hays as the officers who arrested him or who allegedly threw him against the trunk of the police car. *See* docs. 42-25; 42-26; 42-27. In fact, Officer Evans attests that he, McKinley, and Owens were the officers who took Wendell to the ground, arrested him, and took him into custody. Doc. 42-5 at 6. Significantly, Wendell does not challenge this fact, *see* doc. 46, even though he has the burden of proving his claims. The defendant Officers' motion is due to be granted because vague allegations are insufficient to support a claim, especially where, as here, the BPD has identified three other officers as the

responsible parties (none of whom are defendants in this case). *See* doc. 17 at 3-5; *see also Huntsville*, 608 F.3d at 736-37 (granting summary judgment for the defendants because the plaintiff failed to sue the officer who had actually arrested and handcuffed her). Additionally, although Wendell claims that the supervisor on the scene—who conceivably could have been Hays, a defendant in this case— mocked him and declared that this was "his street," doc. 42-26 at 4, 7, he does not assert, and this court cannot find authority establishing, that this behavior violates clearly established federal law. *See Bender v. Brumley*, 1 F.3d 271, 274 n.4 (5th Cir. 1993) ("Mere allegations of verbal abuse do not present actionable § 1983 claims. . . . [A]s a rule, mere threatening language and gestures of a custodial officer do not, even if true, amount to a constitutional violation.") (quotations and citations omitted). Because Wendell fails to establish that any of the defendant Officers actually subjected him to excessive force and because an officer's taunting behavior cannot sustain a constitutional violation here, the motion for summary judgment as to Wendell's claims against Sipes, Hays, Jackson, and Higgins is due to be granted.

To summarize, as to Count I, only the claims against Sipes related to the initial encounter at the CITGO survive.

## B. Constitutional Claims Against Chief Roper and the City[15]

In Count II, Plaintiffs assert a cause of action against Chief Roper and the City for the violation of their Fourth, Fifth, and Fourteenth Amendment rights. Doc. 17 at 10. Allegedly, Chief Roper and the City failed to "instruct, supervise, control and discipline" the Officers regarding their alleged penchant to conduct illegal searches, impose excessive force, illegally arrest and prosecute, and conspire to violate civilians' constitutional rights. *Id.* at 12. In these circumstances,

> Section 1983 also creates a cause of action against municipalities; indeed: Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy . . . officially adopted and promulgated by that body's officers[ or where the] constitutional deprivations visited [are] pursuant to governmental 'custom[.]'"

*Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). In other words, a municipality is responsible for its own acts but not the acts of its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-79 (1986); *see also Monell*, 436 U.S. at 691 (concluding that "a municipality cannot be held liable *solely* because it employs a tortfeasor") (emphasis in original). Thus, a municipality is liable under § 1983 only "when execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell*, 436 U.S. at 694. "'A policy is a

---

[15] To the extent that Plaintiffs allege a cause of action against Chief Roper in his official capacity, summary judgment is due to be granted because the City remains a defendant in the case. *See Busby*, 931 F.2d at 776.

decision that is officially adopted by the municipality, or created by an official of

such rank that he or she could be said to be acting on behalf of the municipality.'"

*Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (quoting *Sewell v. Town of*

*Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)). "'A custom is a practice that

is so settled and permanent that it takes on the force of law.'" *Id.* (quoting *Sewell*,

117 F.3d at 489). "In order for a plaintiff to demonstrate a policy or custom, it is

generally necessary to show a persistent and wide-spread practice." *McDowell v.*

*Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotations and citations omitted).

*But see Pembaur*, 475 U.S. at 480 (holding that a municipality may, under certain

circumstances, be held liable under § 1983 for a single decision). Therefore, to

establish § 1983 liability against a municipality, the plaintiff must show the

individual carried out the alleged actions pursuant to (1) a policy, ordinance,

regulation or decision officially adopted and promulgated by the municipal's duly-

authorized policymakers, or (2) a custom, even though such a custom has not

received formal approval through the municipal's official decision-making

channels. *Monell*, 436 U.S. at 690-91.

Plaintiffs seem to assert that BPD has a policy or custom of conducting

illegal searches and exerting excessive force. Doc. 17 at 10. However, Plaintiffs

seemingly rely on their own experience as proof that the City has promulgated a

policy or custom of unconstitutional behavior: "The fact that the precise conduct

complained of in this very case was treated so routinely as to warrant zero attention, evidences the apparent pervasiveness of the conduct and the cause and effect of the allegations Plaintiffs make." Doc. 46 at 23. This contention is unavailing because Plaintiffs' encounter with the police, without more, cannot establish a finding of a custom or policy tolerant of illegal searches or excessive force. *See Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy."). Additionally, although Plaintiffs include the BPD's training instructions for investigative stops and frisks, doc. 46-1 at 2-3, they fail to articulate how this policy violates citizens' constitutional rights. They also fail to present evidence regarding the BPD's use of force policies. Without additional evidence of alleged illegal stops or excessive force, Plaintiffs cannot meet the bar requiring that, "to demonstrate a policy or custom, [plaintiffs] generally must show a persistent and wide-spread practice" of violations. *See McDowell*, 392 F.3d at 1290.

Next, as to the negligent training and failure to supervise claims, these claims are only actionable under § 1983 when the municipality "inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Failure to

train or supervise is only a policy when the plaintiff can establish "deliberate indifference" to those the police encounter. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and that the municipality made a deliberate choice not to take action." *Gold*, 151 F.3d at 1350.

Here, however, Plaintiffs assert no evidence of prior incidents of excessive force or harassment involving the Officers, or that Chief Roper or the City had notice of these alleged incidents prior to December 22, 2011. Indeed, the disciplinary action reports against the Officers that Plaintiffs have submitted do not present evidence of substantiated claims of excessive force or inappropriate stops.[16] Plaintiffs present no further proof of excessive force issues in BPD, nor, as already mentioned, do they present the BPD's training policies on use of force. Plaintiffs seem to submit the BPD training manual regarding its policy on investigative searches and stop-and-frisks as proof of inadequate or improper training, doc. 46-1 at 2-3, but they fail to establish how the training on reasonable

---

[16] As of December 22, 2011, Sipes had one formal disciplinary action taken against him for a comment Sipes made to a defendant as he was sitting in the back of a patrol car. Doc. 46-3 at 5. Hays's disciplinary record similarly has one incident; he was censured for failing to respond to a domestic incident. *Id.* at 2. Jackson had two disciplinary actions on his record as of December 22, 2011: for insubordinate and disrespectful behavior towards a superior officer and for telling a student, "This is why kids like you can't learn . . . because of ignorant parents like your mom."[16] *Id.* at 4. Finally, Higgins had in his file a suspension for fifteen days and a letter of reprimand for violations in serving civil court subpoenas. *Id.* at 3.

suspicion and stop-and-frisks indicate improper training and supervision. Overall, Plaintiffs fail to allege what specific kind of training or supervision was in place regarding force, what events or incidents occurred that would put the City on notice of the need for more or different training or supervision on excessive force or unlawful searches, or how the training and supervision at the time caused the alleged deprivation of Plaintiffs' rights. Without such a showing, Plaintiffs cannot establish negligent training or supervision. *See Gold*, 151 F.3d at 1350-51.

Therefore, summary judgment is due to be granted on all claims against Chief Roper and the City, including the claim for punitive damages against the City which, as Plaintiffs concede, doc. 46 at 25 n.16, municipalities are immune from unless authorized by statute. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

## C. State Claims

The court now turns to the state law claims. Plaintiffs allege assault and battery (Count III), false light (Count V), and invasion of privacy (Count VI) against all Defendants, and negligent supervision and/or inadequate training (Count IV) against only Chief Roper and the City.

### 1.  Claims Asserted Against All Defendants (Counts III, V, and VI)

The defendant Officers contend that they are entitled to state-agent immunity under ALA. CODE § 6-5-338(a). The court agrees with the Officers generally.

Under Alabama law:

> "A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, *or serving as peace officers under circumstances entitling such officers to immunity pursuant to §6-5-338(a), Ala Code 1975.*"[17]

*Ex parte City of Midfield*, 161 So. 3d 1158, 1163 (Ala. 2014) (emphasis in original) (quoting *Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006)). Plaintiffs do not appear to dispute that the Officers were acting within the scope of their law enforcement duties. Therefore, to prevail, Plaintiffs must present evidence that the Officers fall into one of the exceptions to state-agent immunity. *See Midfield*, 161 So. 3d at 1164 (citing *Hollis*, 950 So. 2d at 309). The only potential exception in this case provides that "'a State agent *shall not* be immune from civil liability in his or her personal capacity . . . when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or

---

[17] Section 6-5-338(a) provides peace officers with "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

under a mistaken interpretation of the law.'" *Id.* at 1163 (emphasis in original) (quoting *Ex parte Cranman*, 792 So. 2d 392, 405) (Ala. 2000)). The court finds no evidence of willfulness or maliciousness by Officers Hays, Higgins, and Jackson with respect to the alleged assault and battery claim (Count III) against them, or that the Officers willfully, maliciously, or fraudulently sought to place Plaintiffs in a false light (Count V) or to invade their privacy (Count VI). Summary judgment is therefore due to be granted on Counts V and VI for the Officers, and to Hays, Higgins, and Jackson as to Count III. However, because, as discussed above, there are disputed issues of material fact regarding whether Sipes properly seized, searched, and used force against Flarenzell in his initial stop, the court declines to award immunity under state law to Sipes for Count III regarding the search and altercation with Flarenzell.

Turning next to Plaintiffs' claims against Chief Roper and the City in Counts III, V, and VI, the relevant state law provides that:

> No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty . . . .

Ala. Code § 11-47-190 (1975). Thus, "under § 11-47-190, a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts of its employees." *Huntsville*, 608 F.3d at 743. Furthermore, a city

is not liable for willful, reckless, or wanton acts of its employees. *See Altmayer v. City of Daphne*, 613 So. 2d 366, 369 (Ala. 1993) (affirming summary judgment as to claims of willful and reckless misrepresentation by noting that § 11-47-190 only imposes liability on a municipality for neglect, carelessness, or unskillfulness of an agent); *Hilliard v. City of Huntsville*, 585 So. 2d 889, 892 (Ala. 1991) (holding that § 11-47-190 does not include an action for wanton conduct).

Therefore, to hold the City liable, Plaintiffs must show that (1) the Officers acted within the scope of their employment; and (2) their actions were negligent, careless, or unskillful. *See Huntsville*, 608 F.3d at 743. As discussed above, only the second requirement is at issue here, as Plaintiffs do not deny that the Officers were acting within their discretionary authority. As such, to prevail against the City, Plaintiffs must show that the Officers' conduct was not intentional. Plaintiffs cannot make this showing because, under Count III, they allege that the Officers acted "intentionally," doc. 17 at 14, as well as pursuant to "neglect, carelessness or unskillfulness," *id.* at 15, 16. For Counts V and VI, Plaintiffs similarly assert that the Officers were acting "negligently, willfully, recklessly, and/or maliciously." *Id.* at 19, 20. Significantly, Plaintiffs fail to provide evidence to support their contentions. Instead, construing the facts in the light most favorable to Plaintiffs, Sipes's search and seizure of Flarenzell, as well as the unnamed "big guy, the big police [officer's]" and the female officer's seizures of Bernadine, appear

intentional. Plaintiffs have failed to show that Sipes or the unknown big officer and female officer acted negligently, carelessly, or unskillfully. Additionally, the City's policies, which it trains its officers on, require officers to comply with constitutional requirements. Doc. 42-7 at 4-5. If, in fact, Flarenzell and Bernadine are correct about the conduct of Sipes, the female officer, and the unknown officer, this is hardly conduct that seems negligent or careless. To the contrary, as Plaintiffs frame the facts, the alleged conduct was intentional, wanton, or reckless. As such, because liability does not attach to municipalities for intentional, wanton, or reckless acts of its employees, summary judgment is due to be granted on Counts III, V, and VI as they pertain to Chief Roper and the City.

### 2.  Claims Against Only Chief Roper and the City (Count IV)

Finally, Plaintiffs assert in Count IV that Chief Roper and the City "negligently, carelessly or unskillfully failed to adequately train and supervise its police officers in the areas of excessive force, arrest procedures, investigatory stops, and detainments." Doc. 17 at 16, 17. Because Count IV advances a claim of *negligent* supervision and training, Plaintiffs are not seeking to show that Chief Roper, in his capacity as Chief of Police and ultimately in charge of the supervision and training of the BPD police officers, *id.* at 17, acted willfully or wantonly. As such, Chief Roper is entitled to immunity for his negligent actions unless he falls into an applicable exception to § 6-5-338(a). The only applicable

exception here involves willful or wanton conduct; however, by the very terms of the tort for negligent supervision and training, this exception cannot apply. Chief Roper is therefore entitled state-agent immunity under § 6-5-338(a).

Under *Ex parte City of Tuskegee* and other established Alabama precedent, because Chief Roper is entitled to immunity for the claim of negligent supervision and training, the City is similarly entitled to immunity. *See* 932 So. 2d 895, 910 (Ala. 2005). Additionally, even if Plaintiffs were to pursue a claim against the City under § 11-47-190, which holds municipalities responsible for the neglect, carelessness, or unskillfulness of its employees, *see, e.g.*, *Huntsville*, 608 F.3d at 742-43, such a claim would fail because they have not presented the required showing: "affirmative proof that the employee's incompetence was actually or constructively known by the master," *Borton v. City of Dothan*, 734 F. Supp. 2d 1237, 1259 (M.D. Ala. 2010) (relying on *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003)). The summary judgment record lacks any "affirmative proof" that the City was on notice as to as to failures in its training and supervisory protocols. As such, Chief Roper and the City's motions for summary judgment on this claim are appropriately due to be granted.

## IV.   CONCLUSION

In sum, except for the claims against Sipes related to Counts I (Fourth Amendment only) and III for the initial encounter with Flarenzell, Defendants' motion for summary judgment is due to be granted**.** The court will enter a separate order granting in part and denying in part the motions for summary judgment.

**DONE** the 4th day of November, 2015.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE